IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| **WILLIAM JOSEPH DEMIERO**, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Case No. 24-cv-1936 |
| **DIGIDAY MEDIA**, | ) ) ) |  |
| Defendant. | ) ) |  |

## COMPLAINT

Plaintiff William Joseph DeMiero ("Plaintiff" or "Mr. DeMiero"), in support of his Complaint against Digiday Media ("Digiday" or "Defendant"), hereby states the following:

## NATURE OF THE ACTION

1. This defamation action arises from an article published on Digiday's online platform on December 8, 2023 titled, "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana" (the "Article" or the "Digiday Article"). A true and correct copy of the Article is attached hereto and incorporated by reference as **Exhibit A**.

2. The Article contains numerous false and defamatory statements about Mr. DeMiero intended to suggest that Mr. DeMiero was ineffective as a CEO, responsible for the loss of business and key talent, and that he did not leave Interpublic Group (IPG) of his own volition.

3. As a direct result of the publication of the Article, Mr. DeMiero has suffered significant losses, including the loss of new employment opportunities.

-1-

## PARTIES

4. Plaintiff William Joseph DeMiero is an individual and a resident and citizen of the State of Texas.

5. Defendant Digiday Media is an online digital media platform with its headquarters and principal place of business in New York. Defendant is a Connecticut limited liability company with a single member who is a resident and citizen of Connecticut. According to Digiday's own website: "Digiday publishes every day, across the world," and has 1.3 million monthly users. Fast Company has called Digiday "an important resource and authority in the world of digital media."

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Texas while Defendant is a citizen of New York and Connecticut. Thus, there is complete diversity between the parties. Additionally, the amount in controversy exceeds $75,000.

7. This Court has general personal jurisdiction over Defendant as Defendant is a corporation registered in Connecticut and whose sole member is a resident and citizen of Connecticut.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant resides in Connecticut.

## FACTS

*Mr. DeMiero's Tenure at UM*

9. Universal McCann ("UM") is an international media and advertising agency. It is a privately held company and subsidiary of publicly-traded Interpublic Group ("IPG").

10. Mr. DeMiero was appointed U.S. CEO of UM in January 2022.

11. In this role, he reported to the Global CEO, who in turn reported to a business unit (IPG Mediabrands) CEO, who in turn reported to the CEO of IPG.

12. During Mr. DeMiero's tenure, and as a direct result of his leadership, UM won several new accounts, including GEICO and General Mills, which were two of the biggest reviews in the industry in 2022 and 2023.[1]

13. Also during Mr. DeMiero's tenure, and as a direct result of his leadership, UM received multiple public awards in recognition of its performance, including Ad Age's "U.S. Media Agency of the Year;" Campaign's "Media Agency Global Network of the Year;" and thirteen different "Best Places to Work" recognitions, including Fortune's "Best Workplaces," Newsweek's "Greatest Workplaces for Diversity," and Campaign's "Sustainability Standout." Publicly available reports confirm all of this.[2]

14. In 2022, employees of UM nominated Mr. DeMiero for Ad Age's "40 Under 40" Award, which is one of the most competitive and highly coveted awards in the advertising industry, and he won the award.[3] In their nomination, employees wrote, among other things: "I've never

---

[1] *See, e.g.*, Brian Bonilla & Erika Wheless, *General Mills Hires IPG's UM As Global Media Agency*, Ad Age (Oct. 19, 2023), https://adage.com/article/agency-news/general-mills-hires-ipgs-um-global-media-agency/2523461; Press Release, IPG Mediabrands, *IPG Mediabrands Wins GEICO's $1.4B Media Review* (Feb. 23, 2023), https://www.ipgmediabrands.com/ipg-mediabrands-wins-geicos-1-4b-media-review/.

[2] *Agency Performance Review 2024: UM North America*, Campaign US (Apr. 9, 2024), https://www.campaignlive.com/article/agency-performance-review-2024-um-north-america/1866892 (reporting that in 2023, UM increased new business revenue by 36% year over year; saw organic growth across more than 40% of its clients; won GEICO, General Mills, and Boeing, and other clients; and decreased employee turnover from 29% to 17.5%); Parker Herren, *UM drives major growth through retail media: UM is Ad Age's 2024 Media Agency of the Year*, Ad Age (Mar. 11, 2024), https://adage.com/article/special-report-agency-list-creativity-awards/best-agencies-2024-um/2543106; *UM Crowned Campaign Media Agency Global Network of the Year* (May 18, 2023), https://www.prnewswire.com/news-releases/um-crowned-campaigns-media-agency-global-network-of-the-year-301828905.html (discussing UM receiving Media Agency Global Network of the Year" in Campaign's 2022 Global Agency of the Year Awards).

[3] *How W. Joe DeMiero is changing UM's culture*, Ad Age (September 19, 2022), https://adage.com/article/special-report-40-under-40/40-under-40-w-joe-demiero-us-ceo-um/2427646

had this much access to or transparency from an agency CEO;" "I feel more a part of the agency;" and "Committed to nurturing ethical leadership, Joe has personally created a year-long personal and professional development track for high potential leaders."

15. In 2022, UM employees nominated Mr. DeMiero for the Male "MAKER" Award, in recognition of his allyship with the women's movement and female upward mobility, stating: "Under his leadership, UM has placed 69% of new female talent in Manager+ positions."

16. Mr. DeMiero received the highest marks ("Exceeds") in his performance reviews throughout his tenure.

17. In 2023, Mr. DeMiero's father became severely ill, and was placed in hospice care. Mr. DeMiero departed IPG in a mutually-agreed-upon manner, so that he could care for his father's immediate medical needs. The decision for Mr. DeMiero to step down was not prompted in any way by his performance as U.S. CEO of UM or UM's business performance.

*Publication of the Digiday Article*

18. On December 8, 2023, Digiday published an article by Michael Bürgi on its online platform with the title, "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana" (the "Digiday Article" or the "Article").

19. Despite the fact that Digiday had contacted Mr. DeMiero for comment in connection with its stories **nine times** between 2016 and 2021, neither Mr. Bürgi nor anyone else at Digiday contacted Mr. DeMiero for comment on the Article before it was published. This omission reflects a willful and/or reckless avoidance of the truth.

20. The central theme of the Article was that Mr. DeMiero was ineffective as a CEO and left under unfavorable circumstances. This stood in direct contrast to prior articles that Digiday itself had published touting the growth and success of UM under Mr. DeMiero's leadership. For example, just a year before the Article was published, the same author, Mr. Bürgi, reported how,

as of December 2022 (a year into Mr. DeMiero's tenure as U.S. CEO of UM), the company was successfully expanding its commerce practice for several major clients, including growing the practice from one employee to 50, and went from $125 million in ad spend to $1 billion.[4]

21. Telling of the lack of basic editorial diligence, Mr. Bürgi misspelled Mr. DeMiero's name throughout the Article as "Joe DiMiero."

22. The Article contained numerous false and defamatory statements concerning Mr. DeMiero. In the Article, Mr. Bürgi wrote:

- "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana"

- "Quintana replaces Joe DiMiero [sic], who was appointed U.S. CEO in January 2022 but has had a troubled tenure marked by client losses, a questionable management style and high-level executive departures."

- "DiMiero [sic], who internal sources said hasn't been seen for weeks in meetings he was expected to attend…."

- "Under DiMiero [sic], there have been at least three rounds of layoffs in 2023…."

- "One of those sources attributed the loss of clients Nationwide and Zillow to DiMiero [sic]."

- "Two sources said DiMiero [sic] ultimately ran afoul of Eileen Kiernan, global CEO of Mediabrands, the umbrella under which UM sits alongside Mediahub, Initiative and Magna."

23. To promote traffic to the Article, Mr. Bürgi posted to X/Twitter: "Joe's tenure was, shall we say, troubled" with a link to the article. Digiday then liked Mr. Bürgi's post.

---

[4] *See* Michael Bürgi, *UM expands commerce media practice for clients Johnson & Johnson, EJ Gallo Winery, others with newly expanded unit*, Digiday (Dec. 14, 2022), https://digiday.com/media-buying/um-expands-commerce-media-practice-for-clients-johnson-johnson-ej-gallo-winery-others-with-newly-expanded-unit/.

24.     Further reflecting Mr. Bürgi's willful ignorance of the subject matter of his own articles, Mr. Bürgi commented on his own post: "This story probably didn't help his case," referencing an article Mr. Bürgi had published in Digiday days earlier about client losses and layoffs happening elsewhere at IPG, **which was not under Mr. DeMiero's purview as CEO of UM U.S.**

25.     Notably, at least two of the sources for the defamatory content in the Digiday Article were knowingly biased and/or unreliable. One of the sources was Mr. DeMiero's successor, who had big shoes to fill after the departure of Mr. DeMiero – a successful, well-respected and well-liked predecessor – and was, thus, incentivized to advance her own position by diminishing Mr. DeMiero's. Another source was a former UM Global executive who has proven herself to Digiday to be an inaccurate historian: Digiday used this woman as a source for another article, but then discovered the information she provided was inaccurate and was forced to retract.

*The Statements in the Digiday Article Were False and Defamatory*

26.     The statements in Digiday's Article are demonstrably false and defamatory.

27.     During Mr. DeMiero's tenure, UM won numerous public awards in recognition of its success. In fact, during Mr. DeMiero's time as U.S. CEO, UM significantly increased its commerce billings, making it the largest commerce practice in the industry.

28.     Contrary to the statements in the Digiday Article, *no one* on Mr. DeMiero's executive leadership team left the agency during his tenure. The three executive departures that took place at the agency during Mr. DeMiero's tenure were members of the UM Global team that either reported to or were in the chain of command for UM's Global CEO, not Mr. DeMiero as

U.S. CEO of UM. Two of those executives wrote public articles about why they departed UM, neither of which mentioned Mr. DeMiero or anything relating to him.[5]

29. Nor were there any layoffs, let alone "three rounds of layoffs," attributable to Mr. DeMiero's purview as UM's U.S. CEO in 2023. Any layoffs that allegedly occurred in 2023, again, were from UM Global or elsewhere at IPG, which were not under Mr. DeMiero's purview as U.S. CEO of UM. Instead, throughout Mr. DeMiero's tenure at UM and at the time the Digiday Article was published, UM was seeking to expand its workforce and had dozens of open new hire positions posted to its publicly available "careers" website and on LinkedIn. This job creation was a direct result of Mr. DeMiero's new business wins and organic growth of current clients as U.S. CEO. As has been reported in other trade publications, under Mr. DeMiero's leadership, UM U.S. saw 36% year- over-year improvement in new business wins, and organic growth across 40% of its clients.

30. Further, contrary to the Digiday Article's statement that Mr. DeMiero "hasn't been seen for weeks in meetings he was expected to attend," Mr. DeMiero did not miss any meeting that he was scheduled to (and therefore expected to) attend in the months prior to his departure.

31. Indeed, in the weeks prior to the publication of the Digiday Article, Mr. DeMiero was actively involved in more than a dozen new business pitches and had a full schedule of client and internal meetings in Los Angeles, Detroit, and New York. He also participated as a panelist at industry events during this period, which were promoted publicly by other trade publications. Also

---

[5] Allison Schiff, *Why Joshua Lowcock Hopes His Exit From UM Will Spark Actual Change*, Ad Exchanger (Oct. 23, 2023), https://www.adexchanger.com/agencies/why-josh-lowcock-hopes-his-exit-from-um-will-spark-actual-change/; Ariella Garcia, *An Industry In Conflict: It's Time For Tough Questions And Hard Decisions*, Ad Exchanger (Sept. 18, 2023), https://www.adexchanger.com/marketers/an-industry-in-conflict-its-time-for-tough-questions-and-hard-decisions/.

in the weeks prior to publication of the Article, Mr. DeMiero held weekly, all-agency meetings called "Java with Joe," broadcast on Zoom for all employees, as had been his tradition from the start of his tenure.

32. While he served as U.S. CEO, Mr. DeMiero's schedule was published internally and could, therefore, be easily reviewed.

33. Moreover, contrary to the statements in the Article, UM did not "lose" Zillow or Nationwide as clients due to Mr. DeMiero. UM transferred Zillow as a client to a sister agency, Mediahub, due to a contractual conflict with another client. And, Nationwide gave UM notice that it was putting its business under review *before* Mr. DeMiero joined UM.

34. The Article falsely states that Mr. DeMiero "ran afoul" of global CEO Eileen Kiernan. To the contrary, Mr. DeMiero and Ms. Kiernan remain friends as well as close professional contacts. On numerous occasions, both verbally and in writing, Ms. Kiernan has spoken favorably about Mr. DeMiero and his tenure at UM, and rated him "exceeds" in his performance reviews, the highest possible rating.

*Consequences of the Digiday Article*

35. Publication of the Digiday Article has been and continues to be the singular cause of Mr. DeMiero significant reputational and professional harm, including the loss of multiple lucrative employment opportunities.

36. Following his departure from UM, Mr. DeMiero was being considered for the Chief Marketing Officer position at an international restaurant chain. Mr. DeMiero had engaged in numerous discussions and interviews with executives at that international restaurant chain, including that company's Chief People Officer ("CPO") in early 2024, and was made aware he was the only candidate left in their search for the position. By this time, Mr. DeMiero was communicating with the CPO on a near daily basis, had aligned on compensation terms for the

role, and had completed required psychological and IQ examinations for the position conducted by a third party, who noted that, based on their evaluation, Mr. DeMiero would be their recommendation for both the CMO role and successor to the international restaurant chain's current CEO.

37. Then, on February 16, 2024, the CPO texted a link to the Digiday Article to Mr. DeMiero and wrote, "Hey Joe have time to chat about this today?" Mr. DeMiero replied "of course" and asked the CPO what time he could speak that day. When Mr. DeMiero did not receive a response, he texted again on February 26, 2024 to ask if the CPO had "a few minutes to catch up today." The restaurant chain's CPO did not reply until the following day, February 27, 2024, and stated: "Hey Joe busy time board next week. Can I give you a shout tomorrow?"

38. On February 28, 2024, Mr. DeMiero emailed the restaurant chain's CEO and wrote: "[CPO] called me to chat about the Digiday article, but I wanted to reach out directly to see if you have a few minutes to connect." Mr. DeMiero further wrote: "As I shared with [CPO], the article came as a real sucker punch, because there is zero truth to what is in it, it was harmful to former clients and current employees, and was an unfounded personal attack on me." On March 11, 2024, Mr. DeMiero texted the CPO again to check in. Mr. DeMiero wrote: "I emailed [CEO] but haven't heard back yet. Let me know what you suggest." On March 19, 2024, the restaurant chain's CEO replied to Mr. DeMiero's February 28th email and informed Mr. DeMiero he was no longer being considered for the role.

39. Thereafter, Mr. DeMiero was under consideration for the position of North America CEO at a large, publicly-traded advertising holding company. Again, after making it through a rigorous vetting process, including dozens of interviews and meet and greets, and alignment on compensation requirements, Mr. DeMiero was informed that he was the final candidate for the

position. Then communication stopped. Mr. DeMiero reached out to the President of the network, who then called Mr. DeMiero and told him that they came across the Digiday Article and, as a result thereof, could not hire him. More specifically, the President told Mr. DeMiero that, while he had the exact character and competency the position required, there were concerns about potential backlash among clients and employees if they were to publicly announce his hiring due to the statements about Mr. DeMiero in the Article.

40. Mr. DeMiero had the same experience when he pursued a global CEO position at a well-respected, publicly-traded marketing agency. After meeting with dozens of people on the executive team, again, Mr. DeMiero was informed he was the final candidate for the CEO position. Then, the managing partner of the third party search firm, responsible for conducting the candidate search process, called Mr. DeMiero and told him that they could not move forward with his hiring due to the Article.

41. In addition, multiple potential employers and reputable candidate search firms have brought up the Article and discontinued talks of Mr. DeMiero's employment as a direct result of the Article. Each of these lost opportunities were for positions in which Mr. DeMiero would earn $3 million or more in annual compensation.

42. Additionally, multiple book publishers have declined to publish Mr. DeMiero's leadership book as a result of the Article. Because of Mr. DeMiero's stellar reputation and success as young business leader, he was able to obtain representation by a prominent literary agent. The process was grueling and included multiple interviews, preparing a book proposal, and, ultimately, writing a book. However, when Mr. DeMiero's literary agent attempted to market Mr. DeMiero's book to publishers, the Article was, once again, a dealbreaker. Overall, the response from publishers was positive – they loved the idea of Mr. DeMiero's book on leadership, felt there was

a viable market for a leadership book written by a younger author – but declined to publish Mr. DeMiero's book because the Article suggested that Mr. DeMiero's leadership style and values were not congruent with what he wrote about in his book.

43. Prior to the Article, for nearly two decades, Mr. DeMiero was invited to judge industry award shows, attend and speak at industry conferences, and provide thought leadership and comment in industry trade publication articles. Since the Article was published, Mr. DeMiero has received no such invitation, further illustrating the reputational harm the Article has caused.

44. Mr. DeMiero has the reputation, talent, and experience to hold some of the most prestigious and high-paying executive positions. He would not have been a final contender for multiple CEO positions, represented by a prominent book agent if he did not, and regularly tapped for commentary as a thought leader if he did not. The Article, and the Article alone, is the fly in the ointment of Mr. DeMiero's success trajectory. The Digiday Article has caused Mr. DeMiero significant, concrete, and completely unjustified harm. Mr. DeMiero brings this action now to clear his name and hold Digiday accountable for its false and defamatory content.

## COUNT ONE

(Defamation/Defamation *per se*)

45. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

46. Defendant published the Article on December 8, 2023 on its online, publicly-accessible platform.

47. The Digiday Article contained the following false and defamatory statements concerning Mr. DeMiero:

- "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana"

- "Quintana replaces Joe DiMiero, who was appointed U.S. CEO in January 2022 but has had a troubled tenure marked by client losses, a questionable management style and high-level executive departures."

- "DiMiero, who internal sources said hasn't been seen for weeks in meetings he was expected to attend…."

- "Under DiMiero, there have been at least three rounds of layoffs in 2023…."

- "One of those sources attributed the loss of clients Nationwide and Zillow to DiMiero."

- "Two sources said DiMiero ultimately ran afoul of Eileen Kiernan, global CEO of Mediabrands, the umbrella under which UM sits alongside Mediahub, Initiative and Magna."

48. These statements are of and concerning Mr. DeMiero, as he is explicitly named in the Digiday Article, albeit with his name spelled incorrectly.

49. These statements carry the unmistakable defamatory meaning, both explicit and implicit, that Mr. DeMiero was involuntarily replaced as CEO of UM and that Mr. DeMiero engaged in mismanagement and neglect as CEO that resulted in client losses and layoffs.

50. These statements are false. Mr. DeMiero voluntarily left his position as U.S. CEO of UM to care for his ailing father. He was not terminated or asked to depart due to his performance as CEO, which did not result in any losses, departures, or layoffs.

51. These statements are defamatory *per se* because they suggest Mr. DeMiero is unfit to perform the duties of his employment and hurt him in his chosen profession/trade.

52. These statements are unprivileged.

53. At the time of publication, Defendant knew these statements were false, or acted in reckless disregard of the truth, or at least acted negligently as to the veracity of these statements. Publicly available information refutes the statements in the Article, which appears not to have been

vetted for accuracy at all. Moreover, upon information and belief, Digidays "sources" clearly bear ill will towards Mr. DeMiero, raising obvious doubts as to the veracity of their statements.

54. By publishing these false statements, Defendant caused harm to Mr. DeMiero's reputation. The injury to Mr. DeMiero's reputation from Defendant's false statements is readily apparent as they lower him in the estimation of the community and deter third persons from associating or dealing with him.

55. As a direct and proximate result of these false statements by Defendant, Mr. DeMiero has suffered damages, including without limitation, damage to his reputation, damage to his personal brand and goodwill in the community as a businessman, emotional suffering and distress, loss of potential income and goodwill associated with lost opportunities, and associated long-term loss of goodwill and marketability.

56. Defendant's actions were malicious, willful, and wanton, and evidence a conscious disregard of Mr. DeMiero's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1) awarding Mr. DeMiero damages of $40,000,000;

(2) awarding Mr. DeMiero punitive damages to the maximum extent permitted;

(3) requiring Defendant to take the Article down (including (a) permanent and complete removal from Defendant's website; and (b) permanent and complete removal of all other references/links to the Article); and

(4) granting such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff William Joseph DeMiero hereby demands a jury trial on all issues so triable.

Case 3:24-cv-01936-OAW   Document 1   Filed 12/06/24   Page 14 of 14

| | |
|---|---|
| Dated:  December 6, 2024 | Respectfully submitted, |

**William Joseph DeMiero**

By his attorneys,

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

<u>/s/ *Lindsay C. Stone*</u>
Lindsay C. Stone (D. Conn. Bar No. ct31140)
Jessica Meyers (*pro hac vice* forthcoming)
30 Rockefeller Plaza
New York, NY 10112
T: +1.212.653.8700
F: +1.212.653.8701
LStone@sheppardmullin.com
JMeyers@sheppardmullin.com

Benjamin G. Chew (*pro hac vice* forthcoming)
Andrew C. Crawford (*pro hac vice* forthcoming)
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1862
Fax (202) 747-3912
BChew@sheppardmullin.com
ACrawford@sheppardmullin.com

**ROGGE DUNN GROUP**

Rogge Dunn (*pro hac vice* forthcoming)
Katie Blakey (*pro hac vice* forthcoming)
Rogge Dunn Group, PC
500 N. Akard Street, Suite 1900
Dallas, Texas 75201-6629
Tel.: 214-220-0077
dunn@roggedunngroup.com
blakey@roggedunngroup.com

-14-